## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 25 2020, 10:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jonathan R. Deenik
Deenik Lowe, LLC
Greenwood, Indiana

ATTORNEY FOR APPELLEES

Heather L. George Myers
Greenwood, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Guardianship of J.W.,

Elaine Kuhns,

*Appellant-Intervenor,*

v.

Britton and Hollie Shoellhorn,

*Appellees-Petitioners.*

June 25, 2020

Court of Appeals Case No. 19A-GU-2813

Appeal from the Johnson Circuit Court

The Honorable Andrew S. Roesener, Judge

Trial Court Cause No. 41C01-1708-GU-129

**Bradford, Chief Judge.**

# Case Summary

Since 2017, J.W. has been under the guardianship of Britton and Hollie Shoellhorn. In August of 2018, the Shoellhorns and J.W.'s paternal grandparents, Dan Koebler and Elaine Kuhns, entered into an agreement (the "Agreed Entry,") which established the Shoellhorns as J.W.'s guardians and granted Koebler and Kuhns, *inter alia*, visitation and communication with J.W. and the ability to participate in her counseling/therapy. In February of 2019, the Shoellhorns moved to modify the Agreed Entry. Following an evidentiary hearing, the trial court modified Koebler and Kuhns's visitation and allegedly modified their ability to participate in J.W.'s counseling. Kuhns contends that the trial court's modification order was erroneous.[1] Because we disagree, we affirm.

# Facts and Procedural History

J.W.'s biological father was killed while serving in the military. J.W.'s mother married Jason Wojcik, who also was Kuhns's son, and he subsequently adopted J.W. It is believed that Wojcik murdered J.W.'s mother and then took his own life. Following the deaths of her parents, J.W. began living with the Shoellhorns in 2017. Around that time, the Shoellhorns, Koebler, and Kuhns engaged in a

---

[1] Koebler does not participate in this appeal.

custody/guardianship dispute regarding J.W.[2] On August 3, 2018, the parties resolved the dispute under the Agreed Entry, which formally established the Shoellhorns as J.W.'s guardians and granted Kuhns visitation rights as follows:

> During the pendency of the guardianship, it is the parties' intention that the family members listed as Parties herein shall have regular visitation with [J.W.] The family members designated as Parties for purposes of sharing visitation shall include the Barbers, the Chemsaks, the Grigsbys, and Dan Koebler and Elain Kuhns (hereinafter "Family Members"). Britton and Hollie Shoellhorn shall be designated as the custodial parents for purposes of the Indiana Parenting Time Guidelines. The parties agree that all Family Members herein shall share the time set forth in the IPTG for a non-custodial parent, with modifications as set forth herein. Due to the distance between the Parties, this shall not include midweek visits. During the school year, the Parties shall modify the IPTG to provide that Family Members shall exercise their weekend visitation during the first and second weekends of each month. During the school year, the Family Members shall use their best efforts to ensure that [J.W.] completes her schoolwork during their weekend visitation. The parties agree that Mother's Day and Father's Day shall be with the Shoellhorns. Holidays shall take precedence over regularly scheduled visitation. If the Family Members wish to exercise any holidays which are only one day in the IPTG, they must exercise those holidays within [J.W.'s] community. The guardians and the Family Members will use their best efforts to divide summer visitation in a manner which will allow [J.W.] to participate in camp and school activities. It shall be the responsibility of the Family Members to reach agreement on the Family Members' division of the allocated visitation. If the Family Members cannot

---

[2] Jacob and Anna Chemsak, Harry and Becky Barber, and Teresa Grigsby were also engaged in the dispute and obtained visitation rights; however, they do not participate in this appeal.

reach agreement on the division of allocated visitation, they may elect to utilize a parenting coordinator if they so agree.

Appellant's App. Vol. II p. 41. The Agreed Entry also stated that Kuhns "may communicate with [J.W.'s] service providers to obtain information and participate in [J.W.'s] plan as necessary and appropriate." *Id.* at 43.

[3] On February 27, 2019, the Shoellhorns moved to modify the Agreed Entry after Kuhns's and Koebler's allegedly inappropriate conduct resulted in J.W. having "experienced increased symptoms of depression, vocalized suicidal ideations and [] expressed great resentment for her grandparents." Appellant's App. Vol. II p. 66. On July 31 and October 30, 2019, the trial court held an evidentiary hearing regarding, *inter alia*, the Shoellhorns' motion to modify the Agreed Entry. Following the hearing, the trial court found the following:

> 5. It bears noting that the litigation preceding the acceptance of the "Agreed Entry" was wrought by emotion and was marked by discord and contentiousness.
>
> 6. This trend, unfortunately, continues to prevail as it relates to [the Shoellhorns] and [Koebler and Kuhns].
>
> 7. The vast majority of the motions pending before the Court are a direct result of the ongoing bellicosity between [the Shoellhorns] and [Koebler and Kuhns].
>
> 8. [J.W.] continues to suffer as a direct result.
>
> 9. [J.W.] continues to participate in counseling/therapy with Nicole Ryan and to receive case management services from Linda Hershman.

10. Ms. Ryan has been providing counseling/therapy services to [J.W.] for two (2) years.

11. [J.W.] continues to need robust support and assistance from both Ms. Ryan and Ms. Hershman.

12. [J.W.] is, presently, experiencing a period of equilibrium as it relates to her mental health symptoms.

13. This occurrence is, however, very recent.

14. From roughly January of 2019 through May of 2019 [J.W.] was articulating suicidal thoughts and ideations.

15. The acuteness of her symptoms required that she be admitted into a partial hospitalization program through St. Vincent Hospital and a subsequent intensive outpatient program.

16. The [Shoellhorns] have been vigilant in ensuring that [J.W.] receives appropriate professional support for her conditions(s) as well as genuine love and affection in their home.

[ … ]

22. The evidence presented at the hearing of this matter lays bare the erosion of trust between [Koebler and Kuhns] and the [Shoellhorns] and the resulting collapse of the mechanics of the "Agreed Entry."

23. The evidence supports the finding that visitation between [J.W.] and [Koebler and Kuhns] has resulted in the exacerbation of mental health symptoms in [J.W.]

24. [J.W.] has formed an opinion that [Koebler and Kuhns] and the [Shoellhorns] are at odds with one another. (An opinion that is supported by the evidence presented herein.).

25. [J.W.'s] mental health condition(s) can produce episodes of physical and verbal aggression. Examples of this aggression are numerous. Two (2) examples are provided below:

a. [J.W.] has lashed out physically and emotionally toward the [Shoellhorns,] including an episode wherein [J.W.] attempted to assault Britton Shoellhorn with a hammer.

b. [J.W.] has verbally attacked [Koebler and Kuhns] during a telephone conversation.

26. Nicole Ryan has expended significant time attempting to ameliorate the regression in [J.W.'s] emotional state as a result of her visitation and communication with [Koebler and Kuhns]. (It bears noting that not every instance of visitation or communication with [Koebler and Kuhns] produces exacerbated mental symptoms in [J.W.] It is true, however, that a not insignificant number of visitations and communications between [Koebler and Kuhns] and [J.W.] have resulted in harmful mental health consequences for [J.W.]).

27. Linda Hershman frequently spends thirty (30) minutes preparing [J.W.] for telephone calls with [Koebler and Kuhns].

28. [J.W.] feels that [Koebler and Kuhns] do not "hear" her and are attempting to take her away from the [Shoellhorns].

29. These beliefs have caused a great deal of angst on the part of [J.W.] and have certainly contributed to the difficulties in the relationship between [J.W.] and [Koebler and Kuhns].

30. It is [J.W.'s] desire to remain in the home of the [Shoellhorns].

31. [J.W.] has formed a strong and positive bond with the [Shoellhorns].

32. The [Shoellhorns] have articulated a desire to adopt [J.W.] (Any petition to adopt [J.W.] is prohibited for a period of thirty (30) months pursuant to the terms of the "Agreed Entry".)

33. The evidence supports the finding that the work done by Nicole Ryan and Linda Hershman was, for lack of a better

description, "undone" following some visits and phone calls between [J.W.] and [Koebler and Kuhns].

34. Certain examples from the hearing provide examples of the issues arising following communications between [J.W.] and [Koebler and Kuhns] as well as the disconnect that has occurred during communications:

> a. [J.W.] became suicidal in January 2019 following her Christmas/New Year's visitation with [Koebler and Kuhns];

> b. A March 2019 phone call between [J.W.] and Elaine Kuhns became heated when [J.W.] refused to acknowledge Ms. Kuhns' birthday and refused to sing "Happy Birthday" on the phone. Ms. Kuhns, frustrated, terminated the phone call. [J.W.] was emotionally distressed as a result and stated she wished Ms. Kuhns was dead;

> c. During a phone conversation in the Spring of 2019 between [J.W.] and [Koebler and Kuhns,] [J.W.] became highly agitated. [J.W.] expressed suicidal thoughts, stated that [Koebler and Kuhns] were mean to the [Shoellhorns;] and, among other statements, referred to Ms. Kuhn's [sic] as a liar and not her real grandmother. [Koebler and Kuhns] became defensive and upset and, as a result, the call was abruptly terminated.

35. The above annotated examples are not the only examples of acrimony, but are illustrative of the fragility of [J.W.'s] emotional condition and how her contact with [Koebler and Kuhns] has, in certain circumstances, operated to her detriment.

36. Nicole Ryan testified unequivocally that contact between [J.W.] and [Koebler and Kuhns] should be supervised.

37. As events like those annotated in paragraph thirty-four (34) have occurred, the [Shoellhorns] have become more protective of

[J.W.] and the relationship between the [Shoellhorns] and [Koebler and Kuhns] has deteriorated.

38. The [Shoellhorns,] by fiat, imposed restrictions and limited the contact and communication between [Koebler and Kuhns] and [J.W.] in contravention of the "Agreed Entry" of August 3, 2018.

39. The [Shoellhorns,] for example:

    a. Refused to provide [Koebler and Kuhns] with information about [J.W.'s] school;

    b. Mandated a change in the location of the pick-up and drop-off for visitation; and

    c. Limited [Koebler's and Kuhns's] communication with [J.W.]

40. These acts were done in willful defiance of the "Agreed Entry" and are, therefore, contemptuous of that order.

41. As a result of the actions taken by the [Shoellhorns], [Koebler and Kuhns,] in turn, became more agitated and aggressive toward the [Shoellhorns].

42. For example, [Koebler and Kuhns] were a part in some or all of six (6) welfare checks and/or complaints that targeted the [Shoellhorns].

43. These welfare checks/complaints were made to [J.W.'s] school; the Greenwood Police Department; the Johnson County Sheriff's Department; the Johnson County Commissioner's Office; Victory Christian Church; and the National Guard.

44. These acts by [Koebler and Kuhns] were an overreaction and led to a further deterioration of the already fractured relationship.

45. Adding fuel to the fire, [Koebler and Kuhns] also initiated a lawsuit against the [Shoellhorns] regarding a train set in possession of the [Shoellhorns].

46. The timing of this action was, at best, poorly considered and, at worst, a malicious attempt to inject more vitriol into an already damaged relationship.

47. This miasma of punch and counter-punch serves as the backdrop for the instant hearing.

48. [Koebler and Kuhns] assert that if the guardianship is terminated and [J.W.] is placed in their care in Pennsylvania, that the conflicts and difficulties that are presently at issue will be remedied.

50. This belief, in the words of the Guardian Ad Litem, is "optimistic" and in the Court's estimation is naïve.

Appellant's App. Vol. II pp. 23–24, 25–29. Based on its findings, the trial court modified the Agreed Entry to permit Koebler and Kuhns to visit J.W. for a supervised forty-eight-hour period every three months and to participate in any counseling or therapy with J.W. if requested by J.W.'s counselor/therapist and approved by the Shoellhorns.

# Discussion and Decision

## I. Visitation Modification

[4] Kuhns contends that the trial court erroneously modified her visitation with J.W. In *K.I. ex rel. J.I. v. J.H.*, the Indiana Supreme Court noted that there was authority for the proposition that the only circumstance under which a

grandparent may seek visitation rights is by filing a petition under Indiana Code section 31-17-5-1, commonly referred to as the Grandparent Visitation Act, which Kuhns did not do in this matter. 903 N.E.2d 453, 463 n.8 (Ind. 2009). In *K.I.*, the Court concluded, however, that because the parties had already expended substantial time and resources litigating the matter and for purposes of judicial economy, the filing of a separate grandparent visitation petition was unnecessary. *Id.*[3] Here, although Kuhns's visitation was provided pursuant to the Agreed Entry rather than the Grandparents Visitation Act, both parties use the modification standard set forth in the Act and therefore our review will as well. "Under the Grandparent Visitation Act, the amount of visitation is left to the sound discretion of the trial court." *In re Visitation of L-A.D.W.*, 38 N.E.3d 993, 997 (Ind. 2015) (internal quotations omitted). A trial court abuses its discretion only when "its decision is against the logic and effect of the facts and circumstances before the court or is contrary to law." *D.G. v. W.M.*, 118 N.E.3d 26, 29 (Ind. Ct. App. 2019), *trans. denied*. Indiana Code section 31-17-5-7 provides that "[t]he court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child." The party seeking a modification in a grandparent visitation order bears the burden of showing that the order should be modified. *In re Adoption of A.A.*, 51 N.E.3d 380, 390 (Ind. Ct. App. 2016), *trans. denied*.

---

[3] The Court ultimately reversed the trial court's award of visitation which relied upon the Indiana Parenting Time Guidelines and remanded the matter with instructions for the trial court to enter findings and conclusions consistent with the Grandparent Visitation Act. *Id.* at 462–63.

[5] Here, we conclude that the trial court was well within its discretion to modify Kuhns's visitation. The evidence presented demonstrates that visitation and telephone calls with Kuhns often escalated J.W.'s mental health issues. At the July of 2019 hearing, J.W.'s case-manager Linda Hershman testified that "[t]here were multiple times that [J.W.] expressed suicidal thoughts after returning from visitation." Tr. Vol. II p. 4. Hershman also testified that J.W. struggled with being unable to share her emotions with Koebler and Kuhns during phone calls and, as a result, was unable to deescalate afterwards, leading to her expressing suicidal thoughts. J.W.'s therapist Nicole Ryan testified that a lot of J.W.'s issues escalated "around visitation, being moved, having to talk to grandparents – paternal grandparents about her emotions, how she's feeling, not being heard." Tr. Vol. II p. 31. Ryan also testified that J.W.'s mental health issues escalated around visits or phone calls with Koebler and Kuhns that did not go well. Moreover, at the October of 2019 hearing, Ryan testified that since the beginning of the evidentiary hearing in July of 2019, J.W. has been "more of a normal child" and "stable." Tr. Vol. II pp. 62–63. Ryan no longer has to keep track of J.W.'s suicidal ideations or anxiety. Ryan noted that since the July of 2019 hearing, visitation with Kuhns had ceased and phone calls were supervised. Ryan recommended supervised visitation in order to help Kuhns communicate with and meet the needs of J.W. when she feels as though Kuhns is not listening to her. Kuhns argues that it is not her visits with J.W. that caused J.W.'s mental health issues, but, rather, the information regarding the on-going litigation that the Shoellhorns shared with J.W. This argument is merely an invitation to reweigh the evidence, which we will not do. *See In re*

*Adoption of O.R.*, 16 N.E.3d 965, 973 (Ind. 2014) (noting that we generally give considerable deference to trial court in family law cases, because it is in the best position to judge the facts, determine witness credibility, and "get a feel for the family dynamics[.]").

## II. J.W.'s Counseling/Therapy

[6] Because the issue was allegedly neither pled nor tried by the consent of the parties, Kuhns contends that the trial court erroneously modified her ability to participate in and/or seek information regarding J.W.'s counseling and treatment pursuant to the Agreed Entry. We, however, disagree with Kuhns's characterization of the trial court's order. We conclude that the trial court merely clarified the Agreed Entry rather than modifying it. The Agreed Entry provided that Kuhns "may communicate with [J.W.'s] service providers to obtain information and participate in [J.W.'s] plan *as necessary and appropriate*." Appellant's App. Vol. II p. 43 (emphasis added). The trial court's order stated that Kuhns was "authorized to participate in any counseling or therapy with [J.W.] if requested by [J.W.'s] therapist/counselor and approved by the [Shoellhorns]. Appellant's App. Vol. II p. 35.

[7] As we read it, the trial court's order does not alter Kuhns's ability to seek information regarding J.W.'s counseling/therapy. Moreover, it does not modify Kuhns's ability to participate in J.W.'s counseling/therapy. Pursuant to the Agreed Entry, Kuhns agreed that her participation in J.W.'s counseling/therapy would be as necessary and appropriate, and the trial court's

order merely clarifies what amount of Kuhns's participation is currently necessary and appropriate. Given the trial court's findings regarding Kuhns's actions and their effect on J.W.'s mental health, we cannot say this clarification is unfounded. Kuhns has failed to establish that the trial court erred in this regard.

[8] The judgment of the trial court is affirmed.

Baker, J., and Pyle, J., concur.